**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSE ARNULFO GUERRERO ORELLANA, on behalf of himself and others similarly situated,<br><br>Petitioner,<br><br>v.<br><br>ANTONE MONIZ, Superintendent, Plymouth County Correctional Facility, et al.,<br><br>Respondents. | Case No. 25-12664-PBS |

**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR RECONSIDERATION OF THE SEPTEMBER 22, 2026 NOTICE ORDER**

There is no reason to vacate this Court's 72-hour notice order and every reason to preserve it. The order is necessary to protect class members' rights under this Court's final declaratory judgment, which the First Circuit affirmed in its entirety. The order was imposed after a fair process that complied with the Declaratory Judgment Act. The order is permissible relief under the relevant provisions of the Immigration and Nationality Act. There is no reason to reverse this order, and certainly no reason that could satisfy the demanding standards of Rule 59(e) or 60(b), the sole authorities upon which the government relies. The motion should therefore be denied.

## BACKGROUND

### A. The Court appropriately enforced its final declaratory judgment after the government's sustained noncompliance.

The underlying declaratory judgment is final and binding on the government. This Court entered the partial final judgment last December. *See* Dec. 19, 2025 Partial Final Judgment (D.E. 113). Among other things, the judgment declared that the government's "policy of subjecting members of the certified class to detention under 8 U.S.C. § 1225(b)(2)(A) without consideration

for bond and a custody redetermination (i.e., bond) hearing is unlawful" and that "[t]he members of the certified class are subject to detention under 8 U.S.C. § 1226(a), including access to consideration for release on bond." *Id.* at 2. The judgment has never been stayed or modified. To the contrary, after the government appealed, the First Circuit affirmed the judgment in its entirety last August.[1] *See Guerrero Orellana v. Moniz*, 188 F.4th 1 (1st Cir. 2026). The First Circuit's mandate issued on October 6.

It is black-letter law that this Court's judgment is *res judicata* and preclusive against all of the government everywhere in any dispute about a class member. *See Sunshine Anthracite Coal v. Adkins*, 310 U.S. 381, 402-03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.").[2] Nevertheless, the government has repeatedly refused to follow the law as declared by this Court, and this Court has repeatedly found it necessary to enforce the judgment pursuant to its broad remedial powers under 28 U.S.C. § 2202.

---

[1] Nine U.S. Circuit Courts of Appeals have now ruled that people like these class members are § 1226(a) detainees who are entitled to bond hearings. Two U.S. Circuit Courts of Appeals (the Eighth Circuit and the Fifth Circuit, which encompasses large detention facilities in Texas and Louisiana) have ruled the other way. *See Lopez Garcia v. Guadian*, 190 F.4th 305, 317 (4th Cir. Sept. 10, 2026) (collecting latest list of circuit opinions). The Supreme Court has granted certiorari on the statutory question in the Second Circuit case, *Rhoney v. Barbosa da Cunha*, 175 F.4th 61 (2d Cir. 2026), *cert. granted* Oct. 1, 2026, No. 26-104, and a decision is anticipated in mid-2027.

[2] *See also Montana v. United States*, 440 U.S. 147, 164 (1979) (holding federal government estopped from pursuing claim that had already been lost in prior proceeding by party under control of federal government); Restatement (Second) of Judgments § 33 ("A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.") & cmts. b & e (explaining that "a declaratory judgment has binding effect with respect to the matters declared whether or not there has been adversary litigation with respect to those matters.").

At first, the government refused to give bond hearings to *any* class members *anywhere*. The Chief Immigration Judge specifically ordered the Immigration Judges not to follow declarations like the one entered by this Court. *See* Request for Status Conference (D.E. 134), Ex. A (Jan. 13, 2026 email from Chief Immigration Judge Teresa L. Riley). On January 29, the Court found that there was "new, undisputed information that class members are being denied bond hearings as provided in the Court's declaratory judgment ruling[.]" *See* Jan. 29, 2026 Order (D.E. 162) at 1. As a result, the Court issued a revised notice pursuant to § 2202 to inform the class members that "many Immigration Judges are presently refusing to provide bond hearings to class members," and that, in such an event, they had a right to file a petition for habeas corpus. *See id.*

After the First Circuit affirmed the judgment, the government adopted a new form of noncompliance: transfers outside the Circuit. As the Court is aware, ICE maintains a sprawling nationwide detention network comprised of hundreds of jails, camps, and private detention facilities. Throughout this case, petitioners and the Court expressed concern about whether the government would try to divest class members of their rights by transferring them to other circuits. These concerns were expressly raised at the summary judgment hearing. *See* Dec. 17, 2025 Tr. at 30-31. In order to defuse the issue, the government conceded this Court's declaratory judgment would apply to class members in this case even if they were transferred to other detention locations. *See id.* at 31. The Court then incorporated that principle into its final judgment. *See* Partial Final Judgment (D.E. 113) ("After joining the class, the member of the certified class shall remain subject to this order notwithstanding any subsequent change in their location, facility of detention, or venue of immigration proceeding."). The government chose not to contest this particular aspect of the judgment in the First Circuit. *See generally* Appellant's Brief, *Guerrero Orellana v. Moniz*,

Nos. 25-2152 & 26-1094 (1st Cir.). The declaratory judgment as a whole has been affirmed. The issue should be settled.

However, after the First Circuit affirmed the judgment, the government suddenly reversed course. This became implicitly clear from the government's status report in early September, where it took a new position that "the First Circuit decision is controlling *within the First Circuit* as to members of the class."[3] *See* Status Report (D.E. 203) at 7 (emphasis added). The government's counsel then explicitly took the position that it would not necessarily provide bond hearings to class members transferred to other locations, but rather the local Immigration Judges ("IJs") would need to conduct a "choice of law analysis" to decide if bond hearings would be provided. Sept. 14, 2026 Tr. at 9. The government also explicitly refused to agree to delay transfers until after a bond hearing had been provided.[4] *See id.* at 20.

At that hearing, the Court indicated that it was contemplating ordering that class members not be transferred until after their bond hearing. *See id.* at 6. The Court also expressed concern

[3] Even the notion that the administrative immigration courts will follow the "law of the circuit" has since been thrown into doubt by the BIA's recent decision in *Matter of J-E-D-C*, where the BIA expressly refused to follow controlling Ninth Circuit precedent on the purported ground that *the BIA* believed the Ninth Circuit did not properly apply prior Supreme Court case law. *See* 30 I. & N. Dec. 162, 164-67 (BIA Oct. 19, 2026). Of course, the Courts of Appeals review the BIA, not the other way around. The BIA's decision reflects the continuing proliferation of lawlessness in the administrative immigration system.

[4] Transfers to the Fifth Circuit are now particularly devastating because the Court of Appeals there, sitting *en banc*, recently ruled that people who allegedly entered the United States without permission and are later arrested inside the United States (such as these class members) not only have no statutory right to a bond hearing, but also that they have no due process rights beyond what is provided in the statute. *Rodriguez v. Vergara*, No. 26-50183, 2026 U.S. App. LEXIS 33063, at *25-29 (5th Cir. Oct. 23, 2026). In contrast, the Constitution provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law." *See* U.S. Const. amend. V. Given that people in immigration detention generally derive their most basic constitutional rights—such as the right to adequate medical care—from the Due Process Clause, and given that many of those rights have no apparent statutory analog, class members transferred to the Fifth Circuit face not only unlawful mandatory detention but also apparently serious risks of other constitutional deprivations while detained.

that, in light of the high level of immigration enforcement activity and the harm that could be inflicted by such transfers, it was important to "do something soon" and on a "fairly tight timetable." *See id.* at 25-26. The Court gave the parties two days to file additional briefs, including concerning its authority to grant further relief relating to transfers. *See id.* at 34-35.

The parties all understood that the question to be briefed related to potential enforcement under § 2202. *See id.* at 14, 24, 25, 36. The government timely filed a 10-page brief on that exact topic, in which it argued the Court had no authority to restrain transfers under § 2202 and confirmed that class members transported to the Fifth and Eighth Circuits would not necessarily get a bond hearing there. *See* Defs.' Br. (D.E. 207) at 5. Petitioner timely filed a brief arguing that the Court had the authority to prohibit transfers under § 2202 or could at least order the government to give the class members, their counsel, and class counsel advance notice of such transfers to allow for a fair opportunity to file a habeas petition before departure. *See* Pl.'s Br. (D.E. 208) at 8-9. The government did not file or seek leave to file any response to class counsel's brief.

The Court entered its latest remedial order six days later. *See* Sept. 22, 2026 Order (D.E. 212). The Court found that the government "expressly refused to commit to not transfer class members who request bond hearings out of the circuit before they receive rulings on their requests for bond." *Id.* at 1. The Court further found that the government "likewise refused to concede that class members who are transferred out of the circuit remain entitled to a bond hearing pursuant to the declaratory judgment that the First Circuit affirmed." *Id.* at 1–2. Pursuant to § 2202, the Court ordered the government to "provide notice of the intended transfer outside of the First Circuit of any class member who requests a bond hearing to the class member, the class member's attorney (if known), and class counsel no fewer than 72 hours before the transfer is initiated." *Id.* at 2. The

order does not block the government from detaining or transferring people—it merely requires notice of the decision to transfer so that the class member has a fair opportunity to seek individual relief before they find themselves on a plane to Louisiana, Texas, or some other distant location where a bond hearing is unlikely to be available.

**B. The 72-Hour Notices are working as designed, and there is no evidence of any prejudice to detainees or the government.**

The 72-hour notices are being served and appear to be working as intended. The government served the first notice on October 5, and, as of the date of this opposition, the government has served 49 notices in total. *See* Declaration of Christopher E. Hart ("Hart Decl.") ¶ 3. The vast majority of the notices (44) indicated an intent to transfer the class member to Louisiana—a Fifth Circuit jurisdiction—with the remaining class members intended to be transferred to either Texas or Arizona.

The notices indicate whether the person already has individual counsel. If they do not, class counsel have contacted prospective counsel who serve the relevant detention centers (Wyatt in Rhode Island, Plymouth in Massachusetts, and Strafford and Berlin in New Hampshire). These prospective counsel then typically contact the class member to determine whether any further action is desired. The PAIR Project, for example, has responded to more than 20 of the notices, typically for class members at Plymouth. *See* Decl. of Irene C. Freidel ("Freidel Decl.") ¶ 9. When contacted, some of those class members indicated a desire to depart the United States, and no further action was taken. *See id.* ¶ 10. Others did in fact want a bond hearing, and the PAIR Project filed habeas petitions on their behalf prior to transfer. *See id*. Some class members who may have initially signed paperwork suggesting a desire to depart the United States prior to speaking with counsel, in fact, upon consultation with counsel, expressed a desire for a bond hearing and pursued a habeas petition, instead. *See id.* ¶ 7. Some of the habeas petitions are

pending, while others have resulted in orders that bond hearings be conducted. *See id.* ¶ 11. At least one class member who received notice and subsequently filed a habeas petition was successfully granted bond. *Id.*

As far as class counsel can determine, this process has not been prejudicial to anybody. The government merely has to provide notice of a decision it already made. *See* Sept. 22, 2026 Order (D.E. 212). Class members who want a bond hearing are given an opportunity to pursue one by filing a habeas petition in the First Circuit. Those who do not want a bond hearing move forward as they otherwise would.

The government suggests essentially two forms of prejudice, but neither appears to be true. First, the government suggests "for a class member who has been granted voluntary departure, the transfer notification process requires the class member to remain in ICE custody for at least an additional three days before ERO Boston can ensure the class member's attendance on their departure flight and ultimate release from ICE custody." Charpentier Decl. (D.E. 216) ¶ 10. However, voluntary departure generally takes time—many people wait weeks or months in detention before they depart, and so there should be ample time to serve the notices without delaying anything. Freidel Decl. ¶ 6. Second, the government suggests that, due to bed space limitations in New England, the notices "may, at times, also force ERO Boston to hold class members in temporary holding facilities," specifically the "hold room" at ICE's field office in Burlington, Massachusetts. Charpentier Decl. ¶ 12. However, having reviewed the notices to date, class counsel are not aware of (and ICE has not identified) any class member who was held long-term at Burlington due to bed space limitations after receiving a 72-hour notice.[5] Rather, it appears

---

[5] Class counsel are aware of one class member who received a 72-hour notice and was held at Burlington for an extended period of time, but it was not because of a lack of bed space. That person had a bed at a long-term detention facility in New England but was reportedly rejected and

that the notice procedure is achieving the effect for which it was designed—preventing class members from being deprived of their rights by surprise transfers to distant detention facilities where they will not receive a bond hearing.

## ARGUMENT

### A. The government cannot meet its burden under Rules 59(e) and 60(b).

The government seeks relief under two separate provisions of the Rules of Civil Procedure: Rule 59(e) (to alter or amend a judgment), and Rule 60(b) (relief from a final judgment, order, or proceeding). It cannot meet the standard for either.

Relief under Rule 59(e) is "granted sparingly, and only when 'the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations.'" *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 930 (1st Cir. 2014) (quoting *Glob. Naps, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 25 (1st Cir. 2007)). "A motion for reconsideration is not the venue to undo procedural snafus or permit a party to advance arguments it should have developed prior to judgment." *Id.* (citing *Iverson v. City of Boston,* 452 F.3d 94, 104 (1st Cir. 2006)). It is also not "a mechanism to regurgitate 'old arguments previously considered and rejected.'" *Id.* (quoting *Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990)).

Similarly, relief under Rule 60(b) is "extraordinary in nature." *Rivera-Velazquez v. Hartford Steam Boiler Inspection and Ins. Co.*, 750 F.3d 1, 3 (1st Cir. 2014) (quoting *Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 19 (1st Cir. 2002)). To obtain relief, the government "must establish, at the very least, 'that [its] motion is timely; that exceptional circumstances exist,

---

returned to Burlington after alleged behavioral issues. The District Judge for this person's habeas petition subsequently granted the government's motion to transfer them to a detention facility outside of the First Circuit. Freidel Decl. ¶ 12.

favoring extraordinary relief; that if the judgment is set aside, [the party] has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted.'" *Id.* at 3–4.

Here, the government can point to no "manifest error of law," nor can it point to any unfair prejudice or exceptional circumstances. To support its motion, the government relies on arguments that 8 U.S.C. § 1252(f)(1) purportedly bars class-wide relief under § 2202, Mem. in Support of Mot. for Reconsideration (D.E. 215) ("Mot.") at 6–11; that the briefing and hearing process prior to the entry of the Order was purportedly insufficient; and that the relief is "not proper." *See* Mot. at 11–20.

None of these arguments can meet the Rule 59(e) or 60(b) standards. The scope of any limitations arising from § 1252(f)(1) was extensively briefed by both parties prior to the Court's decision. *See* Defs.' Br. (D.E. 207) at 5–9; Pl.'s Br. (D.E. 208) at 6–9. The government simply did not prevail on that argument, and for good reason: as described below, the government's position was not correct. The extensive briefing also makes clear that the process was adequate: the Court heard the parties extensively on these issues at the September 14 hearing, *see generally* Sept. 14, 2026 Tr., ordered further briefing, and then issued a decision six days later after reviewing the parties' extensive submissions. There is nothing "extraordinary" about that, and as described below, the process complied fully with the requirements of § 2202. Lastly, the government's argument about the scope of the relief or operational impacts does not present newly discovered evidence not previously available: the Court ordered briefing on transfer-related enforcement, and

ICE could have presented any evidence it wished about potential impacts on its operations. It simply didn't. Relief is therefore not justified under Rule 59(e) or 60(b) standards.

**B. Section 1252(f) does not bar orders requiring notice of transfer.**

The government principally argues that the Court's transfer-notice order violates 8 U.S.C. § 1252(f)(1)—an argument it already made and lost. Mot. at 7. The government's reliance on § 1252(f)(1) continues to be misplaced, including for all the reasons explained in the class's prior briefing. *See* Pl.'s Br. (D.E. 208) at 6-9. This is especially true where the Court has not enjoined or restrained transfers (or any other government operation) at all, but rather merely required the government to give notice of transfer decisions that have already been made.

Section 1252(f)(1) does not bar notice orders. The statute provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." *See* 8 U.S.C. § 1252(f)(1). Although § 1252(f)(1) does not limit individual injunctive relief, it "prohibits federal courts from granting classwide injunctive relief against the operation of [8 U.S.C.] §§ 1221–1231." *Reno v. American Arab Anti-Discrimination Committee*, 525 U.S. 471, 481 (1999). As Petitioner has pointed out elsewhere, where those statutes grant authority to detain, the Supreme Court and First Circuit have held that § 1252(f)(1) prohibits the U.S. District Courts from entering class-wide injunctions potentially requiring *release*. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 547, 551 (2022) (reversing class-wide injunctions requiring bond hearings); *Brito v. Garland*, 22 F.4th 240, 250 (1st Cir. 2021) (same). Section 1252(f)(1) does not bar class-wide injunctions regarding *transfers*, however, because the covered statutes are silent on the authority to transfer detainees around the country.

Nothing in 8 U.S.C. § 1231(g) is to the contrary. That statute provides that the government "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" and authorizes the government to spend certain appropriations "to acquire land and to acquire, build, remodel, repair, and operate" detention facilities. *See* 8 U.S.C. § 1231(g). This provision does not mention transfers, however, and appears to be about brick-and-mortar operations for acquiring and constructing detention facilities. *See id.* In *Aguilar v. ICE*, the First Circuit stated that § 1231(g)'s meaning is unclear (and declined to provide a complete interpretation), but held that, at a minimum, this provision "fails to 'specify' that individualized transfer decisions are in the [government's] discretion." *See* 510 F.3d 1, 20 (1st Cir. 2007). And certainly nothing in § 1231(g) itself or the First Circuit's discussion of that provision suggests that § 1231(g) requires that the government be able to conduct *secret transfers without notice*. As a result, a notice requirement cannot "enjoin or restrain" the operation of § 1231(g) and therefore cannot implicate § 1252(f)(1).

Decisions from other circuits support this analysis. The Second Circuit recently concluded that § 1231(g) "does not address transfers of noncitizen detainees at all." *See Ozturk v. Hyde*, 136 F.4th 382, 396 (2d Cir. 2025) (internal brackets and quotation marks omitted), *reh'g en banc denied*, 155 F.4th 187 (2d Cir. 2025), *appeal dismissed*, No. 25-1019 (2d Cir. July 21, 2026); *see also Vazquez v. Hernandez*, --- F. Supp. 3d ----, No. 25cv5240-TMC, 2026 U.S. Dist. LEXIS 225843, at *10-11 (W.D. Wash. Oct. 1, 2026) ("Requiring notice to class members when they have been identified for transfer to the Fifth or Eighth Circuit does not enjoin that transfer; it simply provides an opportunity for them to challenge that transfer on an individual basis, as § 1252(f) plainly allows."). An injunction requiring notice before transfers cannot and does not enjoin or restrain the operation of § 1231(g) in violation of § 1252(f)(1) if § 1231(g) itself does not address

transfers. *See, e.g., Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020) (holding, in case challenging immigration detainer policy, that § 1252(f)(1) would not bar relief where challenged policies and procedures are not "even codified in the statutory provisions that § 1252(f)(1) encompasses"). For this reason, *NS v. Dixon*, upon which the government relies, is not relevant to the analysis. *See* 141 F.4th 279 (D.C. Cir. 2025). There, the D.C. Circuit held that § 1252(f)(1) barred an injunction prohibiting the U.S. Marshals Service from making certain arrests to enforce immigration detainers. *See id.* at 281. Here, unlike *Dixon*, the court's notice order does not bar arrests, detention, or any other activity addressed by the relevant statutes.

Consequently, § 1252(f)(1) does not apply here. The notice requirement applies when there is an "intended transfer outside of the First Circuit of any class member who requests a bond hearing." Sept. 22, 2026 Order (D.E. 212) at 2. The order merely contains a requirement that the government provide notice of an action it has already decided to take (*i.e.*, the transfer). Providing notice does not block any transfer, but instead gives counsel an opportunity to consult with the class member about whether they wish to take any action in response to the notice. Some people choose to take no action. Others elect to protect their right to a bond hearing by filing a habeas petition, which of course they have every right to do to enforce the Court's final declaratory judgment, as affirmed by the First Circuit. The Court's order was entirely consistent with § 1252(f)(1).

**C. The government received "reasonable notice and hearing" about the Court's potential enforcement order relating to transfers.**

The government also argues that it did not receive "reasonable notice and hearing" prior to enforcement under 28 U.S.C. § 2202. That is not correct.

Section 2202 permits courts to order "[f]urther necessary or proper relief based on a declaratory judgment, after reasonable notice and a hearing." There is no specific requirement

under the statute regarding the form of such "reasonable notice and . . . hearing." Here, the Court entered its revised notice order on September 22, 2026 after ample notice and opportunity to be heard. Specifically, after the First Circuit's August 13, 2026 decision, the Court (1) held a status conference on August 19, 2026, where the Court specifically discussed its concerns about the government's compliance with the declaration, *see* Aug. 19, 2026 Tr. at 12–15; (2) ordered the parties to "submit a status report with their positions on an amended class action notice and proposals for such a notice" by September 11, 2026, *see* Sept. 8, 2026 Order (D.E. 202); (3) held a second status conference on September 14, 2026, where the Court and parties discussed the possibility of transfer-related enforcement and the government's counter-arguments at length, *see* Sept. 14, 2026 Tr. at 5-38; and (4) ordered that the parties each file a brief explaining its position on potential transfer-related enforcement and a proposed order, *see* Clerk's Notes (D.E. 204). The government did file a 10-page brief on exactly that topic on September 16, *see* Defs.' Br. (D.E. 207), and the government never filed or sought leave to file any response to class counsel's brief filed that same day (if it wished to do so, it had six days prior to this Court's order). Everybody involved was well aware that the Court was considering ordering, and was soliciting briefing concerning, the question of transfer-related enforcement under § 2202. *See* Sept. 14, 2026 Tr. at 14, 24, 25, 36; *see generally* Defs.' Br. (D.E. 207). The government had every incentive to bring forth whatever arguments and evidence it had against transfer restrictions or lesser included remedial options such as notice—which class counsel openly argued for as a potential alternative to an outright prohibition on transfers.[6] *See* Pl.'s Br. (D.E. 208) at 8–9.

---

[6] As reflected in its own briefing, the government was aware that the transfer-enforcement under consideration was not limited to a total bar, but included potential orders that might impose lesser enforcement options that could impact the timing of transfers. *See* Defs.' Br. (D.E. 207) at 8 (arguing against "an order that places a hold on transfers for any period of time").

The procedural history thus demonstrates that the Court provided the parties ample notice and opportunity to be heard regarding potential enforcement relating to transfers. Courts have held that such processes satisfy the notice and hearing requirements of § 2202. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (finding reasonable notice where district court noticed intent to enter injunctive relief and directed parties to brief the issue); *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986) (finding reasonable notice of injunctive relief where party was "aware of the possibility"). The Court's approach was especially appropriate considering the government raised purely legal issues in its response to the Court's request for briefing. *See Starter*, 170 F.3d at 299 (finding "paper" hearing sufficient under § 2202); *Tractor & Equip. Co. v. Dual Trucking & Transp., LLC*, No. 15-5413, 2017 U.S. Dist. LEXIS 133964, at *7 (E.D. La. Aug. 22, 2017) (same); *Metro. Prop. & Cas. Ins. Co. v. McCarthy*, No. 2:12-cv-151-NT, 2015 U.S. Dist. LEXIS 122630, at *14 n.6 (D. Me. Sept. 15, 2015) (finding evidentiary hearing unnecessary).

The government's real complaint seems to be that it did not argue certain points in its prior brief. The government did not argue that transfer-related enforcement would fail to satisfy the four-factor test for an injunction. Nor did the government argue that transfer-related enforcement would be operationally infeasible. But given the government had every incentive to present such arguments previously, the omissions reflect waiver, not a defect in notice. *See Biltcliffe*, 772 F.3d at 930 ("A motion for reconsideration is not the venue to undo procedural snafus or permit a party to advance arguments it should have developed prior to judgment."); *De Giovanni v. Jani-King Intern., Inc.*, 968 F. Supp. 2d 447, 449-50 (D. Mass. 2013) (holding argument presented for first time in a motion for reconsideration is waived). In all events, as described below, these new arguments fail.

**D. To the extent applicable, the factors for injunctive relief favor the 72-hour notice requirement.**

The government argues that the Court's § 2202 enforcement order must meet the ordinary requirements for injunctive relief. The government does not cite First Circuit authority for such a proposition, and in all events, the argument is waived for the reasons described above. However, even assuming the transfer-notice requires such an analysis, each factor plainly favors the Court's order.

First, the harm is irreparable. A class member transferred without notice to the Fifth Circuit (where most detainees are intended to be transferred) likely loses the right to a bond hearing, because the Fifth Circuit now holds that § 1225(b)(2)(A) detainees have no statutory or constitutional right to a bond hearing. *See Rodriguez v. Vergara*, No. 26-50183, 2026 U.S. App. LEXIS 33063, at *25-29 (5th Cir. Oct. 23, 2026). No remedy at law is available to compensate a class member for this loss of rights and resulting unlawful detention without process, which this Court has already concluded constitutes irreparable harm. *See, e.g.*, *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 306 n.2 (D. Mass. 2025). Second, the balance of hardships favors class members. The order is narrow: it requires only 72 hours' notice of a transfer the government has already decided to make, and only for class members who request a bond hearing. Third, enforcement serves the public interest. There is no public interest in allowing the Executive to disregard and evade a final judgment of an Article III court setting forth the law. *See Sunshine Anthracite Coal*, 310 U.S. at 402-03; *see also Marbury v. Madison*, 5 U.S. 137, 177 (1803).

**E. The Court's order is narrowly tailored and is not overbroad or unworkable.**

Lastly, contrary to the government's argument, the Court's order is not overbroad or unworkable. The order is in fact appropriately narrow: it requires only notice "72 hours before the transfer is initiated" and applies only to "class member[s] who request[] a bond hearing." *See*

Sept. 22, 2026 Order (D.E. 212) at 2. The order does not itself prohibit the government from transferring any class member, but merely gives class members who appear to want a bond hearing the opportunity to act (or not) on an individual level before the government transfers them to a place where they will likely be deprived of that right.

Practically speaking, it is important to recognize that class members may request bond hearings in various ways. Class members often receive a Notice of Custody Determination form during booking, and they can request a bond hearing by checking a box on that form. They can also request a bond hearing directly from the Immigration Court. *See* 8 C.F.R. § 1003.19(b).

It is also important to recognize that a request for a bond hearing does not necessarily terminate immediately upon an Immigration Judge's decision. The bond proceeding may continue for a significant period of time where, for example, the class member appeals an adverse decision to the BIA, *see id.* § 1003.19(f), or pursues an additional bond hearing based on materially changed circumstances. *See id.* § 1003.19(e). Class members may also need to contest unlawful bond hearing procedures via federal litigation (which could be raised in a new habeas proceeding or in a motion to enforce a prior habeas order). *See, e.g.*, *Delmyr v. Moniz*, No. 26-13833, 2026 U.S. Dist. LEXIS 231002, at *8-9 (D. Mass. Oct. 8, 2026); *Almeida v. Moniz*, No. 26-12207, 2026 U.S. Dist. LEXIS 212096, at *6 (D. Mass. Sept. 18, 2026); *Romero-Nolasco v. McDonald*, No. 25-12492, 2026 WL 2318111, at *3 (D. Mass. Jan. 14, 2026).

Given this diversity of circumstances, the Court appropriately ordered notice simply for a class member who "requests a bond hearing," rather than trying to parse out the various ways in which a request might be made or trying to limit the notice to a particular period of time after the request is first submitted. Any attempt to do so would not only have prejudiced the class members, but also likely would have been more administratively burdensome than helpful. Any incidental

overbreadth (while unlikely) is far preferable to the burdens of an individualized inquiry for each class member into the precise nature of the request for bond, all the accompanying facts and circumstances, and/or all the events that transpired thereafter merely to decide if they should get a one-page notice. That additional procedure would be unworkable and burdensome, and the Court's simpler solution inflicts no harm. Class members who receive the notice are not under any obligation to act on it. If they desire no further action in response to the notice, they will simply decline to act, as has occurred in several circumstances.

Nevertheless, the government argues the notice is overbroad for essentially five reasons, each of which is wrong:

First, the government argues that the notice "requires ERO Boston to hold detainees in temporary facilities [(*i.e.*, the Burlington booking area)] pending identification of appropriate bed space." Mot. at 18. This assertion is not properly supported, however. For one thing, the transfer notice only applies to transfers *outside* the First Circuit. ICE is free to house detainees at any of its numerous facilities within the First Circuit without serving the notice or after the notice has been served.[7] And beyond that, the government has not provided evidence that this is actually

[7] The ICE website currently lists the detention facilities in the First Circuit as including Wyatt in Rhode Island, Plymouth in Massachusetts, and Strafford and FCI Berlin in New Hampshire. *See* https://www.ice.gov/detention-facilities?state=All&office=Boston%20Field%20Office&name=. All of these facilities house men, and the Strafford facility also houses women.

happening. Class counsel are not aware of any class member who was held long-term at Burlington due to bed space limitations after receiving a 72-hour notice.[8]

Second, the government argues that the Court's order "effectively requires notice of transfer of all class members—not just those who have requested a bond hearing." Mot. at 18. Class counsel certainly have no complaint about the government giving transfer notices to any class member, but also fail to see why doing so unfairly prejudices the government. At worst, the government may serve some extra notices—a circumstance triggered not by the class or the Court, but by the government's sustained noncompliance with the Court's final judgment. If a class member has not requested a bond hearing, and does not want a bond hearing, they can simply ignore the notice.[9]

Third, the government objects that notice may be required for people who indicate interest in voluntary departure and also request a bond hearing. Mot. at 18-19. This is likely occurring because people are often presented with voluntary departure paperwork at booking along with the Notice of Custody Determination, and some people (perhaps due to language barriers or lack of opportunity to consult with counsel) presumably both sign the voluntary departure form *and* check the bond hearing box on the custody notice. When the notices are served, counsel have found that some of these people want a habeas petition to seek a bond hearing, and others have asked for no action to be taken. Freidel Decl. ¶ 10. Either way, there should be no prejudice to the class

---

[8] As noted above, class counsel are aware of one class member who received a 72-hour notice and was held at Burlington for an extended period of time, but not apparently due to any bed space limitation. *See* n. 5, *supra*.

[9] By definition the class members are not subject to post-final order detention under 8 U.S.C. § 1231, *see* Dec. 19, 2025 Partial Final Judgment (D.E. 113) at 2, so it would not appear there would be any particular urgency to transfer them anywhere—particularly away from their presumably pending removal proceedings.

member, because voluntary departure generally takes weeks or even months to effectuate—certainly enough time for a 72-hour notice. *See id.* ¶ 6.

Fourth, the government objects that the order requires notice after the person receives a "substantive bond hearing." Mot. at 19. It is not entirely clear to class counsel what the government believes distinguishes a "substantive" bond hearing from any other bond hearing. But in all events, as described above, the bond hearing process does not necessarily end with the initial hearing, and so continuing notice is certainly appropriate, useful, and efficient.

Fifth, the government objects that the notice "requires notice of intended transfer of class members outside the First Circuit, even if the transferee detention facility is within a jurisdiction where the governing law is consistent with that of the First Circuit." *Id.* The government is well aware, however, that transfers are often serial—once a person is outside of the First Circuit, what is stopping the government from sending them hours or days later to Texas or Louisiana? Freidel Decl. ¶ 13. Generally speaking, their counsel, their families, this Court's declaration and notice requirement, and class counsel's resources to assist them all exist *here*. There is nothing improper about the Court's current order.

Lastly, even if the Court accepted the government's assertions (which it should not),[10] this information is not "new evidence" allowing for the extraordinary relief contemplated by the Rules. These are, at worst, operational complications of the government's own making, existing solely because it has insisted on a transfer process that will likely deny class members the possibility of receiving bond. If the government's motion is granted, the result will be manifestly unfair

[10] If the Court believes that these operational concerns may warrant substantive changes to the current notice, Petitioner respectfully requests the parties be permitted to conduct targeted discovery to allow the parties to present evidence to the Court sufficient to allow for a finding of facts and to assure the Court that the notice conforms to the relevant detention and transfer circumstances.

prejudice to the class members and a potential increased burden on this Court as the volume of habeas petitions from people concerned by the possibility of transfer once again increases. If the government encounters exceptional circumstances rendering the notice unduly burdensome to a class member in a particular case, class counsel are certainly available to confer. But granting the government's motion to vacate the notice would be tantamount to allowing the government to operationalize bond denial despite the Declaratory Judgment. The government's motion should be denied.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court deny Respondents' Motion for Reconsideration (D.E. 214).

Dated: November 3, 2026

Respectfully submitted,

*/s/ Anthony D. Mirenda*

Anthony D. Mirenda (BBO #550587)
Gilleun Kang (BBO #715312)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
(617) 832-1000
adm@foleyhoag.com
gkang@foleyhoag.com

Christopher E. Hart (BBO # 625031)
ANDERSON & KREIGER LLP
255 State St.
Boston, MA 02109
(617) 621-6571
chart@andersonkreiger.com

Jessie J. Rossman (BBO # 670685)
Adriana Lafaille (BBO # 680210)

Daniel L. McFadden (BBO # 676612)
Julian Bava (BBO # 712829)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
dmcfadden@aclum.org
jbava@aclum.org

My Khanh Ngo (admitted pro hac vice)
Michael K.T. Tan (admitted pro hac vice)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
m.tan@aclu.org

Gilles R. Bissonnette (BBO # 669225)
SangYeob Kim (admitted pro hac vice)
Chelsea Eddy (admitted pro hac vice)
AMERICAN CIVIL LIBERTIES UNION OF
NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 333-2081
gilles@aclu-nh.org
sangyeob@aclu-nh.org
chelsea@aclu-nh.org

Carol J. Garvan (admitted pro hac vice)
Max I. Brooks (admitted pro hac vice)
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
P.O. Box 7860
Portland, ME 04112
(207) 619-8687
cgarvan@aclumaine.org
mbrooks@aclumaine.org

Annelise M. Jatoba de Araujo (BBO # 669913)
ARAUJO & FISHER, LLC
75 Federal St., Ste. 910
Boston, MA 02110

(617) 716-6400
annelise@araujofisher.com

Sameer Ahmed (BBO #688952)
Sabrineh Ardalan (BBO # 706806)
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
Harvard Law School
6 Everett Street
Cambridge, MA 02138
(617) 384-0088
sahmed@law.harvard.edu
sardalan@law.harvard.edu

*Counsel for Petitioner*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be served on counsel for all parties through the Court's CM/ECF system.

Date: November 3, 2026

*/s/ Gilleun Kang*
Gilleun Kang